**FILED**
**IN CLERK'S OFFICE**
**U.S. DISTRICT COURT**
**E.D.N.Y.**
**\* JANUARY 8, 2025 \***
**BROOKLYN OFFICE**

HDM/JPL:JKW/SMS/AT
F. #2020R00228

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

DAVID COOPER,
RANDY GREWAL,
JOHN LOWE,
    also known as "Clams," and
RICHARD RINGEL,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

INDICTMENT

Cr. No. **25-CR-10**
(T. 15, U.S.C., §§ 78j(b), 78ff; T. 18,
U.S.C., §§ 371, 981(a)(1)(C), 2 and 3551
et seq.; T. 21, U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))
**Judge Ramon E. Reyes, Jr.**
**Magistrate Judge Lois Bloom**

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise stated:

I.    Background

    A.    The Defendants and Relevant Individuals and Entities

        1.    The defendant DAVID COOPER was a resident of New York, New York

and later, Larchmont, New York, and worked as a broker at Broker-Dealer, an entity the identity

of which is known to the Grand Jury.[1] COOPER was registered as a broker with the Financial

Industry Regulatory Authority ("FINRA").

        2.    The defendant RANDY GREWAL was a resident of Anthem, Arizona,

and the sole owner of the trading entity Kierland Capital, LLC.

---

    [1] Broker-Dealer was a broker-dealer with offices in Uniondale, New York and New
York, New York.

3.    The defendant JOHN LOWE, also known as "Clams," was a resident of Sayville, New York and Stuart, Florida, and a manager for JJL Capital LLC and the Chief Executive Officer of Great South Bay Capital LLC, two trading entities.   LOWE and his entities were customers of Broker-Dealer.

4.    The defendant RICHARD RINGEL was a resident of Boynton Beach, Florida and Boca Raton, Florida, and the sole owner of trading entities BMEN Trading LLC and Bellagirl Media LLC.   RINGEL and his entities were customers of Broker-Dealer.

5.    Co-Conspirator #1, an individual whose identity is known to the Grand Jury, was a resident of Hampton Bays, New York, and worked as a broker at Broker-Dealer. Co-Conspirator #1 was registered as a broker with FINRA.   The defendant DAVID COOPER and Co-Conspirator #1 worked together at Broker-Dealer.

B.    Relevant Regulatory Principles and Definitions

6.    A "broker-dealer," also referred to as a "broker," is a person or entity that engaged in the business of buying or selling securities for the account of others or for their own account.

7.    An "issuer" is a legal entity that developed, registered and sold securities.

8.    A "stock" is a type of security that signified proportionate ownership in the issuer.

9.    An "initial public offering" is when an issuer sells shares of its stock to the public on a stock exchange for the first time.

10.    A "secondary stock offering," also referred to as a "secondary offering" or a "follow-on offering," is an issuance of shares of stock by an issuer that has already had an initial public offering.   Shares from secondary offerings are often sold to buyers through a

"syndicate," a group consisting of lead managers—often referred to as "underwriters" or "book runners"—and broker-dealers who market the deal to potential buyers.

11.    "Wall-crossing" refers to the process of giving investors advance or inside information about an issuer.    In a secondary offering, wall-crossing helps the issuer and underwriters ensure that the anticipated pricing is correct and there is sufficient interest in the offering.    Once an investor is wall-crossed, that investor cannot share or trade on the information in the issuer's stock until that information is made public.

12.    To purchase shares in a secondary offering, a prospective buyer must "indicate" an interest for a certain quantity of shares by communicating with a member of the syndicate.    An indication is only a request for shares in the offering, and is not binding.    On the "pricing date," the price of the secondary offering is set by a negotiation between the issuer and the underwriter.    Before the market opens on the next trading day, the shares are "allocated" to buyers that have made an indication of interest.    Each buyer is then notified of the number of shares it has been allocated and the price, and the buyer must accept or reject the allocation.

13.    A "retail investor" is an individual investor who purchases securities for their own personal accounts and generally trades and invests in smaller amounts and volumes as compared to institutional investors (i.e., mutual funds or hedge funds).

14.    A "short sale" is the sale of a stock that the seller does not own.    Short selling involves borrowing shares of a company's stock from a broker for a fee and then selling the borrowed shares.    If, after the shares were borrowed and sold, the price of shares in the company's stock decreased, the short seller could then purchase new shares at a lower price on the open market, and transfer those shares to the broker-lender, thereby capturing as a profit the decline in the stock's share price.    This is referred to as "covering" a short sale.

II.    The Fraudulent Scheme

    A.    Overview

      15.    In or about and between January 2018 and May 2024, the defendants

DAVID COOPER, RANDY GREWAL, JOHN LOWE and RICHARD RINGEL, together with

others, engaged in a fraudulent scheme whereby they systematically executed and caused others

to execute securities transactions in shares of stock of publicly traded companies in advance of

secondary stock offerings based, in whole or in part, on material non-public information

("MNPI") obtained from investment banks involved in those secondary stock offerings.   MNPI

was obtained through various means, including through COOPER and Co-Conspirator #1, who

obtained MNPI in their capacity as employees of Broker-Dealer.   COOPER and Co-Conspirator

#1 improperly disclosed that MNPI to others, including LOWE and RINGEL.   At times, LOWE

then passed MNPI to others, including GREWAL.

      16.    Generally, the underwriters provided MNPI to brokers, including to the

defendant DAVID COOPER and Co-Conspirator #1, in connection with the underwriters'

responsibilities to their issuer clients to "fill the book," or to get retail and institutional investors

to buy into a prospective deal.   That MNPI included specific deal information such as the

identity of the public company issuing the secondary offering; the timing of the deal; the

structure of the deal (e.g., whether the deal included warrants in addition to common stock); and

the price at which the company would offer its stock in the upcoming offering.   To that end, the

underwriters often gave broker-dealers, including Broker-Dealer, a certain allotment of shares in

a secondary offering and relied on employees of the broker-dealers, including COOPER and Co-

Conspirator #1, to market the offering to retail investors and get them to commit to buy shares in

the deal.   If Broker-Dealer successfully solicited investors and filled its allotment in the

prospective deal, Broker-Dealer stood to receive compensation in the form of a sales credit from

the underwriters. The sales credit was calculated based on the number of shares allocated to

investors solicited by Broker-Dealer and the price of the shares. In turn, the defendant DAVID

COOPER and Co-Conspirator #1 stood to receive a portion of the sales credit paid to Broker-

Dealer for the deals COOPER and Co-Conspirator #1 worked on.

17.    In furtherance of the fraudulent scheme, the defendant DAVID COOPER

and Co-Conspirator #1 passed on MNPI they received from underwriters of the secondary

offerings to others, including the defendants JOHN LOWE and RICHARD RINGEL, with

knowledge that LOWE, RINGEL and others would use that MNPI to trade in advance of the

upcoming offerings. At times, LOWE then passed that MNPI to GREWAL, among others. In

addition, as a result of their marketing efforts for the secondary offerings—which included

inducing customers of Broker-Dealer, including LOWE and RINGEL, to purchase shares—

COOPER and Co-Conspirator #1 received a portion of the sales credit paid by the underwriters

to Broker-Dealer for those offerings.

18.    The defendant DAVID COOPER and Co-Conspirator #1 each owed a

duty to Broker-Dealer to maintain the confidentiality of MNPI received in connection with their

employment at Broker-Dealer. This duty of confidentiality included refraining from (1)

communicating MNPI to unauthorized persons outside of Broker-Dealer and (2) disclosing

MNPI to others to use in improper trades. COOPER and Co-Conspirator #1 breached their duty

to Broker-Dealer when they disclosed MNPI to others, including the defendants JOHN LOWE

and RICHARD RINGEL, so that LOWE, RINGEL and others could improperly trade on such information.

19.    Using MNPI they received, directly or indirectly, from the defendant DAVID COOPER and Co-Conspirator #1, the defendants RANDY GREWAL, JOHN LOWE and RICHARD RINGEL executed trades in the relevant issuer's stock in advance of the upcoming secondary offering, typically short selling the stock.   While the fact of a secondary offering typically has a negative effect on a company's stock price because it tends to dilute the value of the outstanding shares, GREWAL, LOWE and RINGEL used MNPI, such as the specific timing of the offerings as well as pricing information, to mitigate potential losses and increase profits at an unfair advantage over the investing public.   As a result, GREWAL, LOWE and RINGEL improperly profited from this trading strategy.

20.    In furtherance of the scheme and in order to conceal it, the defendants DAVID COOPER, RANDY GREWAL, JOHN LOWE and RICHARD RINGEL, and their co-conspirators, took steps to hide the fact that they were passing MNPI to one another and trading on that information, including by (a) speaking on the telephone rather than by text message or email, (b) warning co-conspirators to do the same and (c) using coded language when speaking on the telephone.

21.    On or about and between January 11, 2023 and April 9, 2023, law enforcement authorities conducted a judicially-authorized wiretap of the defendant JOHN LOWE's cellular telephone (the "LOWE Wiretap").   On or about and between March 11, 2023

and May 6, 2023, law enforcement authorities conducted a judicially-authorized wiretap of Co-Conspirator #1's cellular telephone (the "CC-1 Wiretap").

      22.    The LOWE Wiretap and the CC-1 Wiretap revealed that in connection with numerous secondary offerings between approximately January 2023 and May 2023, employees of Broker-Dealer, including the defendant DAVID COOPER and Co-Conspirator #1, obtained MNPI from investment firms that were underwriting the secondary offerings and provided MNPI to the defendants JOHN LOWE and RICHARD RINGEL, and others, with knowledge that LOWE, RINGEL and others intended to trade securities in advance of secondary offerings based on the MNPI.   Those secondary offerings included for the companies Chicken Soup for the Soul Entertainment, Inc., Revelation Biosciences, Inc. and Tivic Health Systems, Inc., among others (collectively, the "Traded Companies").   LOWE in turn passed MNPI he received relating to the Traded Companies to the defendant RANDY GREWAL.   The timing, pattern and substance of the relevant communications and trades show that the trading done by GREWAL, LOWE and RINGEL in advance of these offerings was based on MNPI that was misappropriated in breach of, among other duties, COOPER's and Co-Conspirator #1's duty to keep confidential MNPI they obtained in the course of their employment at Broker-Dealer.

    B.    <u>Fraudulent Trading on MNPI in the CSSE Secondary Offering</u>

      23.    One of the many secondary offerings that the defendants fraudulently traded on based on MNPI was in shares of common stock in Chicken Soup for the Soul Entertainment, Inc., which traded on the NASDAQ exchange under the stock ticker CSSE ("CSSE").   For example, on or about March 30, 2023 and March 31, 2023, the defendants RANDY GREWAL, JOHN LOWE and RICHARD RINGEL traded common stock in CSSE based on MNPI that the defendant DAVID COOPER received from a representative of Bank #1,

an entity the identity of which is known to the Grand Jury, which served as the sole managing underwriter for the CSSE offering.

        i.      <u>The Defendant JOHN LOWE Learned of Upcoming CSSE Offering</u>

        24.     Intercepted communications from the LOWE Wiretap revealed that on or about March 30, 2023—before CSSE publicly announced its secondary offering—the defendant JOHN LOWE learned from Trader, an individual whose identity is known to the Grand Jury, that CSSE would offer shares of its stock at $2.30 in the secondary offering.   LOWE then told the defendant RANDY GREWAL that CSSE intended to do a secondary offering.   GREWAL subsequently executed short sales for 5,000 shares of CSSE.   Later that same day, LOWE bought 4,500 shares of CSSE to cover a portion of an earlier short position he had in CSSE at a profit, and also executed a short sale for an additional 2,572 shares of CSSE.

        ii.     Bank Employee #1 Communicated Timing of CSSE Offering to the Defendant DAVID COOPER

        25.     On or about March 30, 2023, at approximately 4:11 p.m. EST—approximately seven minutes before CSSE publicly announced its upcoming secondary offering—a representative of Bank #1 ("Bank #1 Employee"), an individual whose identity is known to the Grand Jury, called the defendant DAVID COOPER.   Minutes later, intercepted communications from the CC-1 Wiretap revealed that COOPER called Co-Conspirator #1 and relayed to Co-Conspirator #1 that he had just spoken to Bank #1 Employee and the CSSE offering was coming that day.   At approximately 4:18 p.m. EST, COOPER called the defendant RICHARD RINGEL, and at approximately 4:20 p.m. EST, RINGEL executed a short sale of 1,000 shares of CSSE.

        26.     On or about March 30, 2023, at approximately 4:18 p.m. EST, CSSE issued a press release proposing a public offering of its common stock and indicating that Bank

#1 was acting as the sole managing underwriter for the offering.   There was no pricing information in the press release.

      iii.      **The Defendant DAVID COOPER Obtained MNPI about Pricing of CSSE Offering and Tipped the Defendant RICHARD RINGEL and Co-Conspirator #1**

      27.      After the press release was issued, Bank #1 Employee again called the defendant DAVID COOPER.   Intercepted communications from the CC-1 Wiretap revealed that immediately after his call with Bank #1 Employee, COOPER called Co-Conspirator #1 and relayed that shares of CSSE would be offered at $2.30.   The CC-1 Wiretap revealed the following exchange took place:[2]

| | |
|---|---|
| COOPER: | CSSE, they announced it was trading at three [3.00], three ten [3.10], three twenty [3.20], let me see, all the way down. |
| CC-1: | Where is it at now? |
| COOPER: | Oh, yeah. Pricing it… pricing it at two-thirty [2.30]. |
| CC-1: | Pricing where? |
| COOPER: | Seven million [7,000,000] dollar deal. |
| CC-1: | I, I couldn't hear you, where is it pricing? |
| COOPER: | Two-thirty [2.30]. |
| CC-1: | And it closed where? |
| COOPER: | Three-twenty [3.20]. |
| CC-1: | Three-twenty [3.20]? And it's uh, who is it? Just uh, what's the name of that guy? |
| COOPER: | Just [Bank #1], just [Bank #1], yeah, no, no more. |
| CC-1: | Okay, I remember that. No one? [CHUCKLES] |

---

[2] The excerpts of the conversations set forth herein are based upon draft, not final, transcripts.

. . .

CC-1:        And it's a set price, two-thirty [2.30]?

COOPER:    That's what he told me.

28.    Two minutes after the defendant DAVID COOPER passed the price to Co-Conspirator #1, COOPER called the defendant RICHARD RINGEL.   Although the price of the secondary offering was not public, over the next approximately three hours, RINGEL placed 61 short sales for over 20,000 shares of CSSE.

iv.    Co-Conspirator #1 Tipped the Defendant JOHN LOWE Who Then Passed MNPI to the Defendant RANDY GREWAL

29.    Minutes after Co-Conspirator #1 obtained pricing information for the CSSE deal from the defendant DAVID COOPER, Co-Conspirator #1 sent the defendant JOHN LOWE, the following text message: "Hi. We are in the CSSE deal tonight.   From [Bank #1]...Wall crossed. Closed at $3.20..,Hearing a[] $2.30 pricing .   Need #s. Asap.   Call me Ty."

30.    Intercepted communications from the LOWE Wiretap revealed that approximately five minutes after the defendant JOHN LOWE received this text, LOWE called the defendant RANDY GREWAL and told him that the CSSE offering was pricing at $2.30. GREWAL then bought 5,000 shares of CSSE to cover his earlier short position at a profit.

v.    Subsequent Illegal Trading

31.    Later in the day on or about March 30, 2023, the defendant RICHARD RINGEL again called the defendant DAVID COOPER.   After this call, RINGEL bought 815

shares of CSSE in three transactions to cover some of his earlier short position at a profit.   He also executed six additional short sales for 1,500 shares of CSSE.

32.    Beginning at approximately 4:00 a.m. on March 31, 2023—before CSSE publicly announced pricing information for its upcoming offering—the defendant RICHARD RINGEL bought 29,510 shares of CSSE in 31 transactions to cover his earlier short sales at a profit and purchase additional stock.

33.    At approximately 7:45 a.m. on March 31, 2023, CSSE announced in a press release that it would offer approximately 4.7 million shares of its common stock at $2.30 per share.

34.    After the press release was issued, intercepted communications from the LOWE Wiretap and CC-1 Wiretap revealed that the defendant JOHN LOWE and Co-Conspirator #1 discussed that the CSSE offering had "worked out" for LOWE.   In the hours after the press release was issued, LOWE and the defendant RICHARD RINGEL continued to trade in CSSE and covered their remaining short positions at a profit.

vi.    The Defendants Profited from Their Scheme to Illegally Trade CSSE

35.    Bank #1 paid Broker-Dealer a sales credit based on Broker-Dealer's marketing efforts and the fact that customers of Broker-Dealer, including the defendants JOHN LOWE and RICHARD RINGEL, bought shares in the CSSE offering.   The defendant DAVID COOPER and Co-Conspirator #1 each earned a portion of the sales credit.

36.    As detailed above, the defendants RANDY GREWAL, JOHN LOWE and RICHARD RINGEL were each able to cover their short positions in CSSE at a profit by using MNPI they received from the defendant DAVID COOPER and Co-Conspirator #1, which COOPER and Co-Conspirator #1 had misappropriated in breach of their duties to Broker-Dealer.

11

C.    Fraudulent Trading on MNPI in the REVB Secondary Offering

37.    The defendants also fraudulently traded shares of common stock in Revelation Biosciences, Inc., which traded on the NASDAQ exchange under the stock ticker REVB ("REVB"), based on MNPI.   For example, on or about and between February 7, 2023 and February 9, 2023, the defendant RANDY GREWAL traded stock in REVB based on MNPI that the defendant JOHN LOWE received from a representative of the sole managing underwriter for the REVB offering, Bank #2, an entity the identity of which is known to the Grand Jury.   On or about and between February 7, 2023 and February 9, 2023, the defendant RICHARD RINGEL traded REVB based on MNPI that the defendant DAVID COOPER received from another representative of Bank #2.

i.    The Defendant RANDY GREWAL Learned of Upcoming REVB Offering

38.    Intercepted communications from the LOWE Wiretap revealed that on or about February 6, 2023, the defendant JOHN LOWE learned from the defendant RANDY GREWAL that REVB intended to offer shares of its stock in a secondary offering.   GREWAL urged LOWE to confirm with Bank #2, the sole underwriter on the deal, the specific timing of the deal.   LOWE then communicated with a representative of Bank #2 ("Bank #2 Employee-1"), an individual whose identity is known to the Grand Jury, who informed LOWE that the REVB secondary offering would begin on February 8, 2023, after the close of the trading day.

39.    Less than an hour after his call with Bank #2 Employee-1, the defendant JOHN LOWE communicated the timing of the offering to the defendant RANDY GREWAL. GREWAL then executed short sales of 1,500 shares of REVB.

40.    Subsequently, on or about February 8, 2023, the defendant RANDY GREWAL asked the defendant JOHN LOWE to again confirm with Bank #2 about the timing of

the deal.   GREWAL explained to LOWE that he wanted that timing information to determine

whether to maintain his short position in REVB.   The LOWE Wiretap revealed that the

following exchange took place:

> GREWAL:   Hey um, Johnny, do you think you could go to
> [Bank #2] and just see if that deal is coming tonight
> or not, I'm short, so I don't know if I just take my
> profit or should I just stay short and that's the
> reason I'm asking you.
>
> LOWE:   He said it was coming, he told me it was coming
> yesterday that it was coming tonight.
>
> GREWAL:   I understand.
>
> LOWE:   I'll check with him later.

41.    Approximately four minutes after his call with the defendant RANDY

GREWAL, the defendant JOHN LOWE called Bank #2 Employee-1, who told LOWE that the

offering would close at 12:00 p.m., which information LOWE immediately communicated to

GREWAL.   GREWAL maintained his short position through the trading day on February 8,

2023, until just before the REVB offering was announced on the morning of February 9, 2023.

> ii.    The Defendant DAVID COOPER Obtained MNPI about the REVB
> Offering and Tipped the Defendant RICHARD RINGEL

42.    On or about February 6, 2023, the defendants DAVID COOPER and

RICHARD RINGEL communicated using the telephone approximately seven times.   On or

about February 7, 2023, RINGEL received a call from a phone number associated with Broker-

Dealer, and approximately three minutes later, RINGEL executed the first of 12 short sales of

REVB.

43.    At approximately 12:01 p.m. EST on February 8, 2023, the defendants

DAVID COOPER and RICHARD RINGEL communicated using the telephone.   Less than an

hour later, COOPER called a representative of Bank #2 ("Bank #2 Employee-2"), an individual

whose identity is known to the Grand Jury.   Less than ten minutes after COOPER's call with Bank #2 Employee-2, COOPER called RINGEL.   Shortly thereafter, RINGEL executed two short sales of REVB.

44.    At approximately 9:02 p.m. EST on February 8, 2023, on a telephone call, Co-Conspirator #1 told the defendant JOHN LOWE that REVB intended to offer its common stock at $4.83 but the deal would not be priced until 9:00 a.m. the next day.

45.    At approximately 6:44 a.m. EST on February 9, 2023, the defendant DAVID COOPER called Co-Conspirator #1.   Approximately four minutes later, COOPER called the defendant RICHARD RINGEL.

46.    At approximately 9:42 a.m. EST on February 9, 2023, REVB announced in a press release that it would offer its common stock at $4.83 per share.

47.    The defendants RANDY GREWAL and RICHARD RINGEL covered their short positions in REVB at a profit.

iii.    The Defendants Profited from Their Scheme to Illegally Trade REVB

48.    Bank #2 paid Broker-Dealer a sales credit based on Broker-Dealer's marketing efforts and the fact that customers of Broker-Dealer, including the defendant RICHARD RINGEL, bought shares in the REVB offering.   The defendant DAVID COOPER and Co-Conspirator #1 each earned a portion of the sales credit.

49.    As detailed above, the defendants RANDY GREWAL and RICHARD RINGEL were each able to cover their short positions in REVB at a profit by using MNPI they received from the defendants JOHN LOWE and DAVID COOPER.

D.    Fraudulent Trading on MNPI in the TIVC Secondary Offering

50.    Another secondary offering that the defendants fraudulently traded on based on MNPI was for Tivic Health Systems, Inc., which traded on the NASDAQ exchange under the stock ticker TIVC ("TIVC").   For example, on or about February 7, 2023 and February 8, 2023, the defendants RANDY GREWAL, JOHN LOWE and RICHARD RINGEL traded common stock in TIVC based on MNPI from the defendant DAVID COOPER and Co-Conspirator #1, in advance of the TIVC secondary offering, which was publicly announced at approximately 10:36 p.m. EST on February 8, 2023.

i.    The Defendants JOHN LOWE and RANDY GREWAL Traded on MNPI About the Timing and Pricing of the Upcoming TIVC Offering

51.    On or about February 6, 2023, the defendant RICHARD RINGEL called the defendant DAVID COOPER.   Approximately three minutes later, COOPER called a representative of the sole managing underwriter for the TIVC offering, Bank #3, an entity the identity of which is known to the Grand Jury.

52.    Intercepted communications from the LOWE Wiretap revealed that on or about February 7, 2023, the defendant JOHN LOWE learned from Co-Conspirator #1 that TIVC intended to offer shares of its stock in a secondary offering "tomorrow night" and at a "big discount."   After learning this information, LOWE executed several short sales for approximately 3,000 shares of TIVC.

53.    Additional intercepted communications from the LOWE Wiretap revealed that on or about that same day, February 7, 2023, the defendant JOHN LOWE informed the defendant RANDY GREWAL of the information that LOWE learned from Co-Conspirator #1, namely that the TIVC secondary offering would come the next night at a "big discount" and that

it was "shortable." After learning this information, GREWAL executed several short sales for approximately 5,000 shares of TIVC.

   ii. The Defendant RICHARD RINGEL Executed Short Sales in Advance of the Public Announcement of the TIVC Offering

   54. On or about February 6, 2023, the defendant RICHARD RINGEL spoke to the defendant DAVID COOPER over the telephone several times. After speaking to COOPER, RINGEL executed several short sales for approximately 5,000 shares of TIVC.

   55. On or about February 7, 2023, the defendant RICHARD RINGEL continued executing short sales of approximately 5,810 shares of TIVC.

   56. In addition, on February 8, 2023, the defendant DAVID COOPER spoke with Co-Conspirator #1 and then with the defendant RICHARD RINGEL. Approximately six minutes after RINGEL and COOPER spoke, RINGEL executed several short sales for approximately 9,476 shares of TIVC over a period of approximately 30 minutes.

   iii. The Defendants Profited from Their Scheme to Illegally Trade TIVC

   57. Bank #3 paid Broker-Dealer a sales credit based on Broker-Dealer's marketing efforts and the fact that customers of Broker-Dealer, including the defendants JOHN LOWE and RICHARD RINGEL, bought shares in the TIVC secondary offering. The defendant DAVID COOPER and Co-Conspirator #1 each earned a portion of the sales credit.

   58. The defendants JOHN LOWE, RANDY GREWAL and RICHARD RINGEL all covered their short positions at a profit. LOWE covered his shorts at a profit on February 8, 2023. GREWAL and RINGEL covered their shorts at a profit on February 9, 2023, after TIVC's public announcement of its secondary offering.

E.    The Defendants Profited from their Fraudulent Trading Scheme

59.    Between approximately January 2022 and May 2024, the defendant DAVID COOPER earned at least tens of thousands of dollars in sales credits in connection with secondary offerings Broker-Dealer was involved in.

60.    Between approximately October 2020 and March 2024, the defendant RANDY GREWAL executed short sales in advance of at least 50 secondary offerings.    This trading resulted in profits of at least approximately $100,000.

61.    Between approximately June 2018 and March 2024, the defendant JOHN LOWE executed short sales in advance of at least 200 secondary offerings.    This trading resulted in profits of at least approximately $500,000.

62.    Between approximately June 2020 and March 2024, the defendant RICHARD RINGEL executed short sales in advance of at least 200 secondary offerings.    This trading resulted in profits of at least approximately $500,000.

COUNT ONE
(Conspiracy to Commit Securities Fraud)

63.    The allegations contained in paragraphs one through 62 are realleged and incorporated as if fully set forth in this paragraph.

64.    In or about and between January 2018 and May 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAVID COOPER, RANDY GREWAL, JOHN LOWE, also known as "Clams," and RICHARD RINGEL, together with others, did knowingly and willfully conspire to use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more

17

devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and potential investors in the Traded Companies, in connection with the purchases and sales of securities in the Traded Companies, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

65.    In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants DAVID COOPER, RANDY GREWAL, JOHN LOWE, also known as "Clams," and RICHARD RINGEL, together with others, did commit and cause the commission of, among others, the following:

<u>OVERT ACTS</u>

(a)    On or about February 7, 2023, Co-Conspirator #1 communicated to LOWE information about the timing of an upcoming TIVC offering and the pricing of the deal.

(b)    On or about February 7, 2023, LOWE communicated to GREWAL information about the timing of the TIVC offering and the pricing of the deal.

(c)    On or about February 8, 2023, approximately six minutes after RINGEL placed an outgoing call to COOPER, RINGEL executed short sales in TIVC.

(d)    On or about February 8, 2023, LOWE communicated to GREWAL information about the timing of an upcoming offering by REVB.

(e)     On or about February 8, 2023, COOPER placed an outgoing call to Bank #2 Employee-2.

(f)     On or about February 8, 2023, after COOPER placed an outgoing call to a Bank #2 Employee-2, COOPER placed an outgoing call to RINGEL.

(g)     On or about March 30, 2023, COOPER communicated to Co-Conspirator #1 the price at which CSSE intended to offer its common stock in an upcoming secondary offering.

(h)     On or about March 30, 2023, Co-Conspirator #1 sent LOWE a text message with the price at which CSSE intended to offer its common stock in an upcoming secondary offering.

(i)     On or about March 30, 2023, LOWE communicated to GREWAL the price at which CSSE intended to offer its common stock in an upcoming secondary offering.

(Title 18, United States Code, Sections 371, 2 and 3551 et seq.)

## COUNT TWO
(Securities Fraud – Insider Trading)

66.     The allegations contained in paragraphs one through 62 are realleged and incorporated as if fully set forth in this paragraph.

67.     In or about and between January 2018 and May 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAVID COOPER, RANDY GREWAL, JOHN LOWE, also known as "Clams," and RICHARD RINGEL, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and

artifices to defraud; (b) making one or more untrue statements of material fact and omitting to

state material facts necessary in order to make the statements made, in light of the circumstances

in which they were made, not misleading; and (c) engaging in one or more acts, practices and

courses of business which would and did operate as a fraud and deceit upon investors and

potential investors in the Traded Companies, to wit: in violation of their duties of trust and

confidence to Broker-Dealer, COOPER and Co-Conspirator #1 provided and caused to be

provided material non-public information that they obtained in the course of their employment at

Broker-Dealer to LOWE, who in turn shared it with GREWAL, and RINGEL in anticipation that

LOWE, RINGEL and others would trade securities of the Traded Companies on that

information, and GREWAL, LOWE and RINGEL, knowing that the information had been

obtained in breach of a duty, used it to execute and caused others to execute transactions in the

securities of the Traded Companies, directly and indirectly, by use of means and

instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States

Code, Sections 2 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION<br>AS TO COUNTS ONE AND TWO

68.    The United States hereby gives notice to the defendants that, upon their

conviction of either of the offenses charged herein, the government will seek forfeiture in

accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States

Code, Section 2461(c), which require any person convicted of such offenses to forfeit any

property, real or personal, constituting, or derived from, proceeds directly or indirectly as a result

of such offenses.

20

69.    If any of the above-described forfeitable property, as a result of any act or

omission of the defendants:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property

described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code,

Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

s/
FOREPERSON

*Breon Peace*

BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK